## MINNESOTA MINING & MFG. CO. v. NICHOLS.

### No. 2552.

District Court, D. Maryland.

May 26, 1939.

106

Hershey, Donaldson, Williams & Stanley, Raymond S. Williams and Kenneth H. Ekin, all of Baltimore, Md., and J. T. Basseches, of New York City, and William H. Abbott, of Chicago, Ill., for plaintiff.

Omer T. Kaylor, of Hagerstown, Md., Morton P. Fisher, of Baltimore, Md., and Horace C. Chandlee and Ralph Burch, both of Washington, D. C., for defendant.

COLEMAN, District Judge.

This is a patent suit brought under Revised Statute Sec. 4915, as amended by the Acts of, March 2, 1927, and March 2, 1929, 35 U.S.C.A. § 63, following refusal by the Commissioner of Patents to grant a patent to the plaintiff company as assignee of one George W. Swenson. The patent application involved relates to alleged improvements in granular material such as is particularly used as a surfacing for asphalt shingles and other forms of asphalt roofing, known as roofing granules.

The defendant, Ernest H. Nichols, is the owner of a patent on roofing granules and method of producing same, No. 1,-954,778, issued to him on April 10, 1934, upon application dated November 1, 1932, embracing ten claims, the first six being article claims and the remaining four process claims.

The procedure in the Patent Office affecting the Swenson application and defendant's patent may be summarized as follows: On March 22, 1934, that is, less than a month prior to the issuance of the patent to defendant, Nichols, Swenson prepared an application for a patent in identical language as to claims, with the Nichols patent, and on March 26th the present plaintiff, assignee of Swenson, filed a petition asking that the issuance of the patent to Nichols be withheld. That is to say, plaintiff endeavored to institute what is commonly known as a public use proceeding, on the ground that Nichols' invention had been in use and on sale by a third party for more than two years prior to the filing of his application. On March 28, 1934, this petition was denied, whereupon on the same day Swenson filed his patent application No. 717,851, which is the one here involved, asking that it be placed in interference with the Nichols patent. Prior to the filing of this application, Swenson had attempted to introduce, by amendment, the identical claims of the Nichols patent now in suit into a prior application that had been filed by Swenson on December 19, 1932, Serial No. 647,967, but the Patent Office Examiner held that the specifications of this prior Swenson application could not support the claims of the Nichols patent, and thereupon refused to admit the same. On April 6, 1934, the plaintiff filed a bill in equity in the Supreme Court of the District of Columbia against the Commissioner of Patents, asking that he be required to institute public use proceedings. On April 7th, the bill was dismissed, and on April 10th the patent issued to Nichols. Following Swenson's request, the Commissioner of Patents declared an interference on August 28, 1934, and after the

taking of testimony by both parties, the Examiner of Interferences in the Patent Office on February 20, 1937, awarded priority of invention to Nichols. Thereupon, on March 22, 1937, an appeal from this decision was taken by Swenson to the Board of Appeals of the Patent Office. That Board, after due hearing on January 13, 1938, affirmed, by written opinion, the decision of the Examiner. Thereupon the plaintiff company, invoking, as it had a right to do, the provisions of Section 4915 of the Revised Statutes, as amended, since it had not appealed from the decision of the Board of Appeals to the United States Court of Customs and Patent Appeal, filed, on July 5, 1938, the present suit, the object being to obtain a reversal of the findings of the Patent Office, and more specifically of the final appellate tribunal of that Office, namely, the Board of Appeals, including an order upon the Commissioner of Patents to issue to the plaintiff a patent on the same invention now patented to the defendant Nichols.

There is a procedural question to be first disposed of. It is as follows: Defendant claims that plaintiff is estopped in this proceeding to assert priority of invention because such assertion is inconsistent with the position taken by plaintiff in the Patent Office when it or its assignor Swenson filed a petition for public use proceedings. In other words, defendant claims that one may not deny patentability on the ground of prior public use and upon being defeated upon that issue, assert that he himself is in fact the first and original inventor.

We do not find any merit in this contention. It is the same one that was stressed before the Patent Office in the interference proceedings at the time Nichols moved to dissolve those proceedings and the Patent Office, rightly we think, held that no basis existed on which that interference could properly be dissolved without a determination of the question of priority. The facts are that plaintiff's original and renewed petition for public use proceedings were both denied by the Patent Office because that Office concluded that the evidence was insufficient to make out a prima facie case of public use of the invention in interference. The bill in equity filed in the Supreme Court of the District of Columbia was likewise based on the facts set forth in those petitions, and that Court refused mandamus against the Commissioner simply on the ground that the matter of instituting public use proceedings rested in the discretion of the Commissioner of Patents. When Nichols moved for reconsideration of the Patent Office's action on his motion to dissolve the interference proceedings on the alleged admission by Swenson of non-patentability, because of his attempts to cause the institution of public use proceedings, the Patent Office, through the Examiner of Interferences, again considered this question and reached the same conclusion. In his opinion the Examiner said: "From the motion to dissolve and the motion for reconsideration, it appears that the party Swenson or his present assignee attempted to prevent issuance of the Nichols patent by bringing public use proceedings and attempted by means of mandamus proceedings to compel the Commissioner to grant the petition to institute public use proceedings. Upon refusal of the Commissioner to institute public use proceedings the party Swenson filed his application which is now involved in the interference. Although attempts to institute public use proceedings were continued after the filing of the Swenson application, that filing is deemed to constitute no more than the act of a prudent inventor where it appeared so plain that his attempts to block issuance of the Nichols patent might fail. Having been refused the opportunity of proving public use against the Nichols application, it certainly would not be equitable to thereafter prevent the party Swenson from contesting priority with Nichols, and his prior abortive attempt to institute public use proceedings can not fairly be taken nunc pro tunc to be such an admission as to warrant dissolution of the interference under the practice outlined in the decisions cited by the party Nichols. Now that the attempts to introduce public use proceedings have failed, this failure being prior to the setting up of the interference, it does not appear that Swenson does not desire or expect the allowance of a patent to him, which was the situation in Weston v. Jewell, 1902 C.D. 20.

"Furthermore, in the opinion of the examiner of interferences, the party Swenson is not exactly under the restrictions of the usual applicant in interference with a patentee, because when he initiated his

petition denying the patentability of the claims which later became the issue, Nichols was not a patentee.

"Upon full reconsideration of the motion, it is found that no such admission appears as will warrant dissolution of the interference."

■ We believe that the reasoning of the Examiner is entirely sound and equally applicable to the present proceeding. At most, all that plaintiff has done, both before the Patent Office and in this Court, is first to seek an opportunity to prove public use against the Nichols application and having failed in this, to contest priority with Nichols. The plaintiff cannot be said to have done anything which gives rise to an estoppel, for an estoppel contemplates reliance by one party upon another party's conduct which, if allowed to be repudiated or altered, would cause detriment to the one relying upon it.

Furthermore, it is not without certain significance that, while the plaintiff's petition for public use proceedings was made part of the record in the interference proceedings, and while this whole record is before the Court as one of the defendant's exhibits, this question of estoppel or inconsistency in plaintiff's position as a bar to the present suit has not been raised in any pleading therein.

Turning to the merits of the controversy, the basic question presented is whether the plaintiff's assignor Swenson was, in fact, the inventor of the subject matter of the Nichols patent prior to the first conception date claimed by Nichols which is November 1, 1932. It is to be noted that the claims of the Nichols patent and the claims of the Swenson application, which are identical, relate to both process and article claims. Plaintiff does not contest defendant's claims 9 and 10 which involve certain additional steps in regrinding the quartzitic material, so these are not in issue. Claims 7 and 8 are process claims. Claims 1, 2 and 3 are intermediate article claims, that is, they relate to the granular roofing material, the character of which is here in issue. Claims 4, 5, and 6 are article claims, embracing roofing material mineralized with the granules as set forth in claims 1, 2 and 3. In short, as stated in the specifications, the object of the alleged invention is twofold: (1) to produce roofing granules of a glazed surface type which will properly adhere to the surface of the

roofing in connection with which they are used, it having been found that while glazed granules present an attractive appearance and possess other desirable characteristics, they do not properly adhere to the asphalt base of which the roofing is composed, but become detached therefrom in large quantities and fall to the ground, causing the roof to present an unsightly appearance; and (2) to produce a method of manufacturing roofing granules of the glazed surface type, which will eliminate the waste, as far as possible, resulting from the customary method of making the granule stock of one material, by grinding it and screening it, and by then applying a glazed surface of another material acquired for the purpose at an additional expense.

The Board of Appeals of the Patent Office adopted the finding of the Examiner of Interferences that Swenson had failed to sustain the burden of proof imposed upon him, as a junior party, with respect to all of the counts or claims. Nichols did not attempt to improve upon, that is to advance, the date of alleged conception of his invention beyond his filing date, namely, November 1, 1932. While testimony was taken on his behalf, it was merely for the purpose of controverting the testimony offered by Swenson.

Greatly abbreviated, and without using a large part of the technical terminology employed in the specifications of the Nichols patent, the method prescribed by the inventor for producing his granule is as follows: For the granule base or stock, a silica quartz is used possessing a high degree of hardness and having a high silica content so that it will fuse readily. It is then ground in a crusher to reduce it to comparatively fine particles, namely, those that will pass through a No. 8 screen but are retained on a No. 35. The granules or particles which do not fall within the above range of sizes, namely, waste materials, are salvaged for use in the making of a surfacing mixture for coloring the granules and providing a glazed, irregular surface. This surfacing mixture is produced as follows: A suitable amount of it is placed in a pebble-mill together with proper proportions of boric oxide and color oxide, according to the color desired, and also an amount of water sufficient to dissolve the boric oxide and to insure proper grinding, the boric oxide being used because it is a water-soluble

chemical and also an excellent flux for silica or quartz. This mixture is then crushed and dissolved until all of the particles would pass through a No. 60 screen and range in fineness down to impalpability, that is to say, the particles will include sizes ranging from the finest powder to those that just succeed in passing such screen. There is then added a sufficient amount of water to impart a proper consistency, and the surfacing mixture is complete. The next step in the process of manufacture is the coating of the stock with the mixture made as just described. This is accomplished by thoroughly mixing the stock in a suitable mixing machine in stated proportions. Last comes the heating or firing. This is carried on by subjecting the mixture in a kiln to three temperature zones: the first zone with temperature maintained at approximately 1100° F.; the second, or central zone, being maintained at approximately 1500° F., and the third, or exit end, being maintained at approximately 1200° F. Upon passing through the first zone the stock becomes thoroughly dried. The second is a vitrifying zone. Here the finer particles of the silica quartz contained within the surface coating become completely melted and form a fluid which mixes with the color acid and the boric oxide. The larger particles of the silica quartz, owing to their greater size, do not completely melt down before passing from this vitrifying zone but fuse on their surfaces only. As a result, they do not so mix with the melted, finer particles as to completely lose their identity but remain suspended therein. In the third or last zone, the temperature, which is somewhat lower than in the vitrifying zone, a too sudden cooling of the stock is prevented. Having traversed this zone, the stock passes from the lower end of the kiln into a suitable rotary cooler where its temperature is reduced to a proper degree, and thence the now completed granules pass to storage.

Because of the failure of the larger particles to completely melt down and mix with the melted finer particles, they protrude beyond the surrounding surface of the granule, thus producing the uneven surface condition claimed to be necessary in order to insure proper adherence to the · asphalt surface, to which the granules are applied. It is further claimed that the fused surface of these larger particles, having taken up a proper amount of the color

oxide and the boric oxide, as has also the surrounding surface, the entire surface of each finished granule is not only evenly glazed, but also evenly colored, and possesses a proper degree of "toughness," the latter characteristic being due to the use of the boric oxide.

The specifications contemplate that the portion of the so called waste material remaining on the No. 60 mesh screen will be returned to the pebble mill when making up a subsequent batch of surfacing mixture; and that due to this fact, and also to the fact that the excess surfacing mixture, drawn from the mixer, will be used as a part of a subsequent batch of that mixture when coating the stock, there will be practically no waste whatever in this method of manufacture of granules. In other words, since it is not necessary to purchase special material, as is customary under other methods, for surface glazing, it is claimed that the cost of manufacture is materially reduced and that, at the same time, a process is developed for making roofing granules that possess great durability, that are evenly and brilliantly colored, and, while being highly glazed, are so formed as to insure their proper adherence to an asphalt surface.

Without giving a complete detailed analysis of the opinion of the Board of Appeals of the Patent Office, which is several pages in length, suffice it to say that, summarized, it is to the effect that both with respect to process and material claims, Swenson failed to establish that what he had discovered was the same as the subject matter of the Nichols patent.

Although there has been a full disclosure in the present proceeding of the character and extent of the proof adduced before the Examiner of Interferences upon which the Board of Appeals of the Patent Office based its decision, it is not considered necessary to consider in detail this proof for two reasons: (1) The statute under which the present hearing arises expressly provides that "the record in the Patent Office shall be admitted in whole or in part, on motion of either party, subject to such terms and conditions as to costs, expenses, and the further cross-examination of the witnesses as the court may impose, without prejudice, however, to the right of the parties to take further testimony;" that is to say, the statute in no sense limits the proof to that which was heard by the Patent Office;

and (2) this court is satisfied that the additional proof which plaintiff has presented in this proceeding brings out the issues in a much clearer and more convincing manner than had heretofore been done.

The gist of defendant's contention, both before the Patent Office and in this proceeding: is that the evidence adduced by plaintiff both before the Patent Office and in this proceeding proves that the Nichols patent does not, in fact, contemplate a smooth or glazed surfaced granule, but rather a rough surfaced granule; and that plaintiff's assignor, Swenson, never worked to produce, nor did he produce, a rough surface granule, but that, on the contrary, he was trying to produce, and did produce, a smooth surface granule. Odd as it may seem, there was never introduced before the Patent Office a sample of the material made strictly according to the formula by which, from the uncontradicted testimony of Swenson, the material was made which was sold by Swenson in the summer of 1932, and upon which plaintiff relies; although obviously a most helpful, if not indeed a conclusive method of ascertaining whether, as plaintiff maintains, the claims and specifications of the Nichols patent embrace what Swenson conceived and put into commercial practice in the summer of 1932, is to find what is produced by each formula and to compare the two products, because while of course there may be patentable invention in making something that is old, by a new process, the subject matter of the controversy does not, by its very nature, call for the same nicities or refinements in measurements or materials that are inherent in some other cases. Accordingly, the court adjourned the hearing in order to afford opportunity for both parties to conduct the necessary tests at a laboratory mutually satisfactory, and in the presence of their respective representatives. The hearing was later resumed and testimony heard in the light of the samples that were thus made.

The basic question is simply this: Are any or all of the product or inter-mediate article claims (Nos. 1, 2 and 3), or any or all of the process claims here in issue (Nos. 7 and 8) of the Nichols patent broad enough to embrace respectively the product and process of Swenson? As already stated, it is uncontradicted by the testimony produced both before the Patent Office and in the present proceeding, that Swenson manufactured and sold in August, 1932, granules according to the formula which plaintiff is now relying upon, that is, some three months prior to the first conception date alleged by Nichols. The question, therefore, is: Were the process and product of Swenson the same, or substantially the same, as called for by the Nichols patent?

In addition to Swenson's own testimony, plaintiff relies upon the testimony of its expert Dr. Joseph W. Greig, Petrologist at the Geo-physical Laboratory of the Carnegie Institute, Washington, who, at this court's instance, manufactured samples of the granules according to both the Swenson and the Nichols formula, and testified in detail as to every step which he pursued in each case, and as to the results which followed. There is no proof that Dr. Greig failed to follow with precision the specifications of both formulas in every respect as far as it was possible to do so. A recital of these various steps need not be included here. He found that the granules produced according to the Swenson formula are more closely akin to those called for by the specifications and claims of Nichols, than are the granules produced according to the teachings of the Nichols patent itself. And the same he found to be true with respect to the Swenson formula itself, namely, that it is more responsive to the Nichols claims than is Nichols' formula as described in the patent specifications. He conceded that the two products, when made according to their respective formulas, are different. He demonstrated that the Nichols granule has no glaze, while the Swenson granule has a glaze. In other words, the article produced by following the teachings of the Nichols specifications was not the sort of article that Dr. Greig stated one without experience in this field would expect to be produced, because, according to his interpretation, those specifications called for a glazed granule which he did not get, and which he said could only be got by increasing the amount of boric acid, by raising the temperature and, possibly, by using a different color oxide. Also, he stated that, prima facie, one would be led to expect, when following the patent specifications literally, that the granule produced according to them would be very resistant to weathering, and he doubted whether the granule so produced has this quality. On the other hand, he stated most positively that the granules

produced by the Swenson formula had both the glazed and this resistant quality.

Furthermore, witness Greig, taking the claims of the Nichols patent up one by one, applied their context first to the Swenson formula and product, and then to the formula and product of the Nichols patent specifications, and demonstrated to the satisfaction of the court that both formulas and both products substantially met the requirements of the claims; emphasizing again, however, what has already been referred to, namely, that the granules made under the Swenson formula were more responsive to the description contained in the specifications of the Nichols patent than were the granules made according to those specifications. Dr. Greig pointed out that only the coated surfaces of the Swenson granules were fused, the smaller particles of the coating being completely fused and the larger particles of the coating being partly fused, as defined in claims 7 and 8 of the Nichols patent. He referred to the fact that the use of the word "vitrious" in both claims 7 and 8 as describing the granule stock was, in his opinion, a misnomer, or at least an inaccurate description of the particular kind of granule stock, the use of which was not merely impliedly but expressly called for in the specifications both of the Nichols patent and of the Swenson formula, namely, silica quartz, because "vitrious" indicates a glassy, and not a crystalline material, such as quartz.

It is significant that defendant's counsel did not take advantage of the opportunity, in accordance with the strongly expressed desire of the court, to have defendant's experts, in turn, produce samples made according to the Swenson formula and then to testify, as did Dr. Greig, respecting the characteristics of such granules, in comparison with the Nichols granules. The court feels that defendant's position is greatly weakened by reason of this failure. In other words, defendant's position, which is one of almost exclusive reliance upon the testimony taken before the Patent Office, is far from persuasive in the face of the tangible demonstrations by Dr. Greig of what results from the application of the respective formulas, in the light of the claims of the Nichols patent. The Patent Office did not have the benefit of such comparative, physical demonstrations. Not only were all tests and experiments, embodied in the record that

comes to this court from the Patent Office, made out of the presence of the Examiner, upon whose findings the Board of Appeals relied, but likewise, neither the Examiner nor the Board heard the witnesses. Thus, while it may have been true, as stated in the opinion of the Board of Appeals of the Patent Office, that the Swenson testimony, as read by them, did not show that the specific process defined in the Nichols claims was in the possession of Swenson prior to the filing date of his application, namely, March 28, 1934; and while it may also be true that the testimony, as then read, was not sufficiently convincing to the effect that the granules shipped to Bird & Son, Chicago, in the summer of 1932 were the same or substantially the same as those defined in Swenson's application, or that they were made by substantially the same method as that disclosed in the Swenson documentary exhibits, precisely the opposite has been proved by the Greig demonstrations and not successfully refuted. As already explained, these demonstrations obviously represent a most convincing form of proof. It is not for us to say what might have been the position of the Patent Office Examiner or of the Board of Appeals had they been afforded the benefit of the same laboratory tests and physical demonstrations which this court insisted upon having. Suffice it to say that these things are so much more convincing, because so much more tangible, than the secondhand and documentary testimony brought from the prior litigation, that the whole purpose of this present proceeding would be defeated if this court did not now give to these things the full force and effect to which it believes they are entitled.

It is, of course, true that, while, by the very language of the statute, additional evidence may be introduced, since the question here is one as to priority of invention between contesting parties, the decision of the Patent Office on this question would be controlling in the present suit unless a contrary decision is required by reason of additional testimony which, in character and amount, carries thorough conviction. In other words, the present suit has the characteristics of a proceeding to set aside a judgment, and, therefore, more than a mere preponderance of evidence is necessary in order to reverse the findings of the Patent Office. Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 38

L.Ed. 657; Westinghouse Electric & Mfg. Co. v. DeForest Radio Telephone & Telegraph Co., 278 U.S. 562, 49 S.Ct. 34, 73 L.Ed. 507; Radio Corporation of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163.

We attach relatively much less value to the testimony on both sides as to what the microscopic inspection of the granules shows. The same is true with respect to the microscopic photographs, and the testimony of what the thin sections of the granules show. Visual tests cannot be conclusive, for the question is not whether the two granules produced by the two formulas are precisely the same,—it is conceded that they are not,—but whether the Nichols claims interpreted in the light of the Nichols specifications, are broad enough to embrace the Swenson formula, as known and commercially practised by Swenson several months prior to Nichols' earliest alleged conception.

Defendant further asserts that even if plaintiff's testimony is to be accepted as controlling to the effect that the granules manufactured and commercially disposed of by Swenson in August 1932 contained partly fused and completely fused particles in their coating, nevertheless, Swenson had no conscious recognition at that time, or at any time prior to his learning of the Nichols application, that those granules had such characteristics; in other words, that Swenson at that time was not working to produce a rough surface granule but that on the contrary, he was working to produce a smooth surface granule, and that thus he has not proved any conception of the invention prior to the filing date of the Nichols application.

We consider that this attempted distinction is too much of a refinement and is not borne out by the weight of the testimony, because a comparison of the two products shows that the distinction is a very refined one. Both the product made accordnig to the Swenson formula and the Nichols formula are smooth to a certain extent. Both Swenson and Nichols were trying to produce a glazed product. Nichols patent specifications are replete with the use of the word "glazed." As we have already seen, Dr. Greig testified, and we think successfully demonstrated, that the Nichols granule has no glaze while the Swenson granule has a glaze; yet as he also demonstrated, the granules produced according to the Swenson formu-, la are more closely akin to those called for by the specifications and claims of Nichols than are the granules produced according to the teachings of the Nichols patent itself.

It seems to us idle to say that Swenson's product was not, in fact, recognized by him as embracing the primary distinctive characteristics not only called for by the formula by which he manufactured it in 1932, but which are also called for by the Nichols specifications. Shorn of all extreme refinements which are not permissible in a case of this kind where we are dealing with relatively crude products or materials, it is an accurate statement to say that Swenson, in August 1932, knew and used the Nichols method with operative success. This is sufficient to establish priority. See Smith v. Hall, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049; De Forest Radio Co. v. General Electric Co., 283 U.S. 664, 51 S.Ct. 563, 75 L.Ed. 1339.

Much is attempted to be made by the defendant of the fact that Swenson copied the claims of his application from the Nichols patent under the following circumstances: While an employee of the plaintiff company, to which the president of another company, of which the defendant was and still is chief engineer, sent a copy of the Nichols application and allowed claims, Swenson saw these and promptly thereafter prepared his own application. In other words, defendant claims that the present contention of Swenson that he is the prior party was purely an after-thought, occurring to him for the first time when he learned of what Nichols had accomplished in the Patent Office.

It is well settled that one who extracts claims from an issued patent must show a clear prior disclosure. That is to say, the meaning of counts in an interference is to be determined by the specifications of the application or patent in which the claims originated. See Brand v. Thomas, Cust. & Pat.App., 96 F.2d 301; Moore v. Greene, Cust. & Pat.App., 48 F.2d 960; McIntyre v. Dodge, 58 App. D.C. 273, 29 F.2d 861. But we believe that the plaintiff has clearly sustained this burden that is imposed upon it. There is nothing unusual or to be condemned in what plaintiff did. Copying claims for the purpose of interference is common practice.

In conclusion, we find that plaintiff has submitted clear and convincing proof that the action of the Patent Office must be reversed and the plaintiff accorded the relief sought by its bill of complaint, namely, that it is entitled to a decree directing the Commissioner of Patents to issue to it as assignee of George W. Swenson letters patent embraced in claims 1 to 8 of the patent application of George W. Swenson.