## BULLDOG ELECTRIC PRODUCTS CO. v. GENERAL ELECTRIC CO.

### No. 4422.

Circuit Court of Appeals, Fourth Circuit.
June 24, 1939.

Arthur G. Stone, of Charleston, W. Va., and Daniel G. Cullen, of Detroit, Mich. (A. J. Levin, of Detroit, Mich., Rummel, Blagg & Stone, of Charleston, W. Va., and Butzel, Levin & Winston, of Detroit, Mich., on the brief), for appellant.

Harrison F. Lyman, of Boston, Mass. (A. E. Bobst, of Schenectady, N. Y., C. E. Hammett, Jr., of Boston, Mass., and Price, Smith & Spilman and Howard R. Klostermeyer, all of Charleston, W. Va., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

General Electric Company, plaintiff in the District Court and owner of the Kempton patent No. 1,967,091, issued on July 17, 1934, on an application filed September 30, 1931, brought this suit for infringement of the patent against Bulldog Electric Products Company; and the latter company, as owner of the Frank patent No. 1,995,286 of March 26, 1935, filed a counterclaim alleging infringement thereof by the plaintiff. The District Court held that claims 3, 4 and 5 of the Kempton patent, upon which the plaintiff's suit was based, were valid and infringed, and therefore enjoined further infringement. The court also held that the plaintiff had not infringed the Frank patent, and that the counterclaim should be dismissed without prejudice to the validity of that patent. The defendant appealed from both holdings of the District Court; but we need concern ourselves only with the Kempton patent since the defendant has announced that it appealed from the decision on the counterclaim only in order to bring all material evidence be-

fore this court, and that it does not object to the dismissal of its counterclaim, contesting only the validity and infringement of the Kempton patent.

This patent relates to a device for connecting an electric cooking range to a source of supply of electricity. Such a range requires a heavy current and the accompanying danger to the user presents problems not found in the wiring of other ordinary house electrical devices, such as floor lamps, radios, &c. Prior to Kempton it had been customary to provide in the kitchen or basement of the house a cumbersome box containing a disconnect switch which was permanently connected on one side to the house wiring circuit and on the other side to the range. This receptacle was unsightly and its installation required the services of an electrician whose work had to be supervised by inspectors.

The Kempton device furnishes a better method. It is particularly useful in the installation of an electric range in a completed house. When a house is in course of construction, provision can be made for an electrical connection in a box set into the wall; and this was also done before Kempton; but in a completed house it is expensive and inconvenient to make an opening in the wall so that the structure of the patent, which is small and neat and can be attached to the box in the kitchen, was an improvement over the disconnect switch. As we have seen, the patent provides a system of making an electrical connection between an electric range and the wiring system of a house. It comprises a base and a cover, both of insulating material. The base has an open face, so that the various parts mounted thereon are visible when the cover is removed. Placed in recesses in the base are contact clips adapted to receive the prongs of a plug through openings in the cover. The plug is connected with a cable running to the range, and the receptacle is connected with the cable running to the source of the electrical supply. The essential feature of the device is a metallic anchor plate secured to the back of the base and bent at right angles over the base at its open end, that is, the end usually at the bottom of the receptacle in place, through which connection is made with the house supply. The anchor plate is attached to the baseboard and the bent over portion forms an end wall for the receptacle, while the cover has walls which form the front two sides and the other end of the box. The box is attached at the back to the base-

board. The plate serves to anchor the heavy armoured supply cable which passes through an opening in the bent over portion of the plate and is clamped to the plate.

The plate also furnishes the means by which the electric range is grounded, an essential requirement, since in an electric range three wires of different potentiality are used to obtain different degrees of temperature, and the user may receive a shock unless the charge is carried off by an electrical connection with the ground. Kempton accomplished this by connecting the armour around the cable from the range with the outside of the receptacle and connected the latter with the armour of the supply cable which is customarily electrically connected with the ground. For this purpose, he equipped the anchor plate with fingers so that when the plug is inserted, the fingers make contact with blades on the plug that are connected with the armour on the cable from the range. Thereby a grounding connection was effected without using any of the interior wires of the house circuit, and the connection was broken when the plug was taken out.

Claims 3, 4 and 5 are involved, of which only claim 5 speaks of the grounded attachment. 3 and 5 are as follows:

"3. An electric receptacle comprising a base of insulating material having an open face, contact clips secured in recesses in said base, a flat metallic anchor plate secured to the rear of said base and having a portion extending forwardly at right angles to the base to form an end wall for the receptacle, an opening in the portion of said anchor plate extending forwardly through which conductors may pass and may be secured to said anchor plate, means to connect conductors to said contact clips, and a cover of insulating material secured to said base and having openings in line with said contact clips."

"5. An electric receptacle comprising a base of insulating material having an open face, contact clips secured in recesses in said base, a flat metallic anchor plate secured to the rear of said base and having a portion extending forwardly at right angles to the base to form an end wall for the receptacle, an opening in the portion of said anchor plate extending forwardly through which conductors may pass and may be secured to said anchor plate, means to connect conductors to said contact clips, a grounding strap connected to said anchor plate and having fingers extending along

the sides of the receptacle to complete a ground connection with grounding blades of an attachment cap, and a cover of insulating material secured to said base and having openings in line with said contact clips."

From this statement it is clear even to the uninitiated that whatever of novelty or ingenuity resides in the Kempton structure must be confined within narrow limits. Everyone is familiar with the detachable plug with flat metallic prongs, which can be inserted in the slots of a receptacle on the wall so as to engage therein contact clips connected by wires in the wall to the house current. Familiar electric appliances in the home, such as fans, lamps, radios, &c. and motors in factories are customarily supplied thereby with electricity. The inconvenience and expense incident to the use of such a device as the disconnect switch, above referred to, requiring, the services of an electrician, had been avoided in other electrical appliances for a long time before the patent in suit. Moreover, the specific use of a surface wall receptacle and a detachable plug in connection with an electric range was shown by the patent No. 1,881,883 to Noble of 1932, applied for in 1929, and the patent No. 1,891,153 to Gates of 1932, applied for in 1928, and also by a device manufactured by the Electro Master Company under the Noble patent prior to the introduction of the Kempton device. It is not suggested that these devices were precisely like Kempton, but they demonstrate that his receptacle and detachable plug did not introduce a system of wiring for the installation of electric ranges that was new in all important respects.

It was also common practice before Kempton to provide a surface wall attachment composed of an insulating base and a cover therefor. This is found in the patent to Gates, in the British patent of 1923 No. 193,296, and the French patent issued to the General Electric Company No. 596,230, and in other patents introduced in evidence not necessary to name.

The idea of reinforcing a surface receptacle to receive the conduit or cable containing the wires from the house supply was not new. Kempton provided such reinforcement since it was obvious that some means must be provided by which the cable or conduit enclosing the service wires could be secured. This necessity was common knowledge and had been previously met in various ways. The metal outlet box located within the wall that was known before Kempton was such a means; and so was the metal box of the Hessel patent of 1919. Other patents in evidence also disclose the same idea, although not the same method of construction as the patent.

It remains to consider whether the particular structure which Kempton devised amounted to invention. It is apparent that it comprised little that was not familiar to the art, and that its claim to ingenuity depends upon the peculiar form of the anchor plate described in claim 3 as a metal plate "secured to the rear of said base and having a portion extending forwardly at right angles to the base to form an end wall for the receptacle, (and) an opening in the portion of said anchor plate extending forwardly through which conductors may pass and be secured to said anchor plate". Doubtless this was a convenient and efficient arrangement, but it does not, in our opinion, amount to invention, either when considered by itself or in connection with other parts of the structure that were suggested by prior art devices designed for similar purposes in the same general field. The device of the patent was well within the scope of the skilled worker in the art.

We have noted that in claim 5 mention is made of another feature of the device, that is, "a grounding strap connected to said anchor plate and having fingers extending along the sides of the receptacle to complete a ground connection with the grounding blades of an attachment cap". This additional feature cannot save the patent. Grounding the plugs to receptacles was a common expedient in the art, and is shown in Gates and other patents. Kempton did not discover the need for grounding an electric range, and there was no invention in the specific method he employed, although it differed to some extent from those previously used.

We reach this conclusion notwithstanding the considerable commercial success which the General Electric device has met. It was first put on the market in 1930 and up to October 1, 1936, approximately 240,000 receptacles had been sold, about one-half by the General Electric Company and one-half by three licensees under the patent. Commercial success is not of itself evidence of patentability and may be considered only as a factor entering into the decision when the question of invention is open to doubt. Smith v. Hall, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049; Ottenheimer Bros. v. Libuwitz, 4 Cir., 87 F.2d 190;

International Flatstub Check Book Co. **v.** Young & Selden Co., 4 Cir., 284 F. 831. In the pending case it is admitted that the increase in the number of electric ranges, including those equipped with the Kempton device, which has occurred in recent years, has been due in large measure to the improvement in the range itself.

Having reached the conclusion that the patent in suit is void for lack of invention, we find it unnecessary to discuss the question of infringement by the defendant. The decree of the District Court must be reversed and the case remanded so that the bill of complaint may be dismissed.

Reversed and remanded.