## ARMSTRONG CORK CO. v. UNITED CORK COMPANIES.

### No. 7016.

Circuit Court of Appeals, Third Circuit.

Sept. 27, 1939.

Wall, Haight, Carey & Hartpence, of Jersey City, N. J., and Stebbins, Blenko & Parmelee, of Pittsburgh, Pa. (Thomas G. Haight, of Jersey City, N. J., and Walter J. Blenko, of Pittsburgh, Pa., of counsel), for appellant.

McCarter & English, of Newark, N. J. (Noah A. Stancliffe, Fritz v. Briesen, and Hans v. Briesen, all of New York City, of counsel), for appellee.

Before MARIS, CLARK, and BIDDLE, Circuit Judges.

CLARK, Circuit Judge.

Field Artillery recognizes the mathematical principle underlying the laws of chance and acknowledges the probable error in the distribution of its projectiles. The "shorts and overs" became part of the consciousness of those who participated in the preparation for and conduct of World War No. 1. We think it is not a far fetched metaphor to speak of the relation of the

Circuits and the Supreme Court in patent cases in these firing data terms. The Supreme Court's standard of invention (that shifting fact question) can well be thought of as the target and the efforts of the lower courts to hit it proportionately subject to the law of probable error. The high court has in recent years moved that target-standard back, Smith v. Hall, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049; Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008; General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402; Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 573, 59 S.Ct. 8, 83 L.Ed. 34; Mackay Radio & Telegraph Co. v. Radio Corporation of America, 306 U.S. 86, 59 S.Ct. 427, 83 L.Ed. 506; Honolulu Oil Corp. v. Halliburton, 306 U.S. 550, 59 S.Ct. 662, 83 L.Ed. 980; Electric Storage Battery Co. v. Genzo Shimadzu and Northeastern Engineering Corp., April 17, 1939, 307 U.S. 5, 59 S.Ct. 675, 83 L.Ed. 1071; Toledo Pressed Steel Company v. Standard Parts, May 29, 1939, 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334. One might allow the "inferior courts" a reasonable time to get the new range. Even so, some of the Circuits seem to have fired an unconscionable number of shorts (a battery commander would be relieved). Counsel's appreciation of that last fact underlies, we think, the bringing of the case at bar. It was initiated in the District Court, February 21, 1936, but was not ready for argument here until May 14, 1939. We think that an earlier realization of the Supreme Court's higher standard, on our part, would have resulted in sparing counsel and client their trouble and expense. We, therefore, express to them our regret for the sins of the past.

The art and industry of the disputed patent is the making of artificial or composition cork, Professor Arthur L. Faubel, Cork and the American Cork Industry, published by the Cork Institute of America. Both the natural and industrial history of cork are well known. The bark of the quercus suber, a particular oak indigenous to the basin of the Mediterranean, Blanchard, Cork Oak, 25 Journal of Geography, 241–249, carries out with especial zeal the process underlying the formation of bark generally, Cork—Its Origin, Manufacture and Industrial Uses, Dun's International Review, Vol. 55, 34–36. As a result, the living contents of the cells (tetrakaidecahedral) disappear and are replaced by air while the walls become toughened because of the formation in them of a substance known as suberin, Faubel, Cork and the American Cork Industry, p. 4. From these air cells, cork bark derives those qualities of non-conductivity and specific gravity which give it its manifold utility. Professor Faubel lists the physical properties of cork as follows: buoyancy—light weight, compressibility, resilience, resistance to moisture and liquid penetration, frictional quality, low thermal conductivity, ability to absorb vibration, and stability, Cork and the American Cork Industry, above cited, at p. 5. The learned professor, above cited, succinctly states the genesis of the artificial or composition cork. He says: "The possible uses of natural cork are somewhat restricted by the variability of the material in its natural state and due too to its availability only in pieces that are irregular in size, thickness and shape." Faubel, Cork and the American Cork Industry, p. 26.

The process in its larger outlines would, we think, occur to the most average mechanic, or should we say, organic chemist, and has occurred to them in other industries. We confess that the record leaves us in some doubt as to the exact invention claimed. There seem to be three methods of securing the desired compounding of the cork granules. It can be done either with the help of the resin (a nonvolatile organic substance) in the separate carbohydrate particles of the bark, Patent to Smith, No. 484,345, October 11, 1892, Black and Conant, New Practical Chemistry, p. 459; or it can be done by the elimination of the resin and the application of surface tension (capillary action), Patent to Grunzweig, No. 997,056, July 4, 1911; or it can be done through the use of a binder derived either from the action of a chemical or externally applied albumen or collodion, Patent to Bentley, No. 1,598,039, August 31, 1926, Faubel, Cork and the American Cork Industry, p. 71. The testimony of plaintiff's general superintendent indicates their adoption of the first method:

"Q. 90. What causes them to adhere in the cork board? A. The residual resins after heating, steaming." Record, p. 39.

On the other hand, the patent on which they rely, Bertelsen, No. 1,607,047, November 16, 1926, adopts a variation of the Grunzweig patent, which in turn expressly repudiates the use of such resins: "If the heating is conducted in a closed vessel, the

separate cork particles unite together firmly and adhere to each other even after the natural binding medium such as cork resin has been expelled." Grunzweig, No. 997,-056, p. 1, lines 59–62.

As the essence of all the patents is heat and pressure, we do not feel it necessary to resolve this apparent inconsistency.

We think that this use of heat and pressure is hardly a very signal example of creative imagination. After all, the effect of heat in chemistry (or in any field for that matter) is scarcely much of a current mystery. By the same token, the use of pressure in adhesion is as old as glue and in surface tension as old or older than Newton's Optics. For in the Third Edition of the latter we find the distinguished scientist saying: "The forces which are concerned in these phenomena are those which act between neighboring particles of substances. These also produce the effects of cohesion. The parts of all homogeneous hard bodies which fully touch one another stick together very strongly. I infer from their cohesion that their particles attract one another by some force which in immediate contact is exceedingly strong and at small distances performs the chymical operations above mentioned and reaches not far from the particles with any sensible effect. There are therefore agents in nature able to make the particles of bodies stick together by very strong attraction and it is the business of experienced philosophers to find them out." See, also, Physical Phenomena at Interfaces, Jarman Society, 1925. It may be, therefore, that both the patents to Smith and Grunzweig bear scrutiny. As their consideration might involve scientific matters aliunde the record, we refrain. We base our decision rather upon our agreement with the first reactions of the Patent Office Examiners. We have often thought it would be interesting, and helpful to the patent system, to analyze a certain number of file wrappers from the point of view of original rejection and ultimate capitulation. Our own experience leads us to believe that the Examiner's first guess is usually better than his last. Better, that is to say, in the light of the subsequent legal and industrial history of the patent. Such a task might well have been, or be, undertaken by the Temporary National Economic Committee, pursuant to Public Resolution No. 113, 75th Congress. That Committee has already taken 1159 pages of testimony under the heading Patents—Proposals for Changes in Law and Procedure.

We think the principal case affords an excellent illustration of our meaning. The principal anticipating (by concession) patent to Grunzweig was four times rejected in three years (1908–1911), Record, pp. 378, 381, 384, 387, on reference to Smith. The Smith process prescribed the filling of a mold with "any size pieces of cork", subjecting the mold to heat and pressure, and in the words of the specification:

"* * * The degree of heat employed must be sufficient in connection with the pressure to cement and solidify the pieces of cork with each other, and the exposure of the cork to heat is continued until some of the resinous matter inherent in the cork is driven out therefrom. The application of heat causes the melting of the resinous matter in the cork and ultimately its vaporization, the resinous matter being thereby brought out upon the surfaces of the pieces of cork and between the same and into the interspaces and crevices between the several pieces, the resinous vapors becoming diffused throughout the body of the combined pieces of cork, so as to fill the interspaces and interstices therein. When the vapors condense, they form a cement which unites the pieces of cork and holds them together, protecting and preserving the mass in a high degree from becoming disintegrated or separated when exposed to or immersed in water. In addition to the treatment with heat I apply pressure to the cork, so as to bring the several pieces of cork into close contact and to make their sides and surfaces adhere closely to each other. The pressure is applied before or while the cork is being subjected to heat; but I do not restrict myself in that respect.

* * * * * *

"In cases where it is desired to facilitate the operation of pressing the cork and causing it to readily conform to the shape desired to be given to it by the molds I moisten the cork slightly, *using for that purpose steam* or water, as may be preferred. I do this, also, in cases where the cork is very dry and hard, so as to make the same impressible or pliable under the pressure it is subjected to." Smith, No. 484,345, Defendant's Exhibit D. 12, Record pp. 364–365 (italics ours).

The Examiner expressly relied on these last words in his rejection. He finally, however, surrendered to these arguments: "* * * The present applicant by his

process volatilizes for the most part the resin within the cork so that the cork loses its hardness and by means of the high heat to which he subjects it, he blows out the cells and obtains a product of considerably lower specific gravity, but if the heating is conducted in a closed vessel, the separate cork particles unite together firmly and adhere to each other even after the natural binding medium, such as cork resin, has been expelled.

"Here are two widely different objects, one disclosed by Smith, one by the present applicant; one seeks to keep the resin in as a binder, the other seeks to get rid of it and leave the cork at a much lower specific gravity. The one, Smith, secures his object by baking in an oven or furnace *under pressure,* the other, the present applicant, secures his object by passing a current heating medium through the cork particles and a very high degree of heat sufficient to blow out the cells without burning the cork, by excluding the air during the heating." Letter of October 14, 1908 by attorneys Brown and Seward for Max Grunzweig, Record pp. 379–380 (italics ours).

"Applicant's invention is different from Smith's cited, in a most important particular, in that it would be impossible for Smith, who introduces *pressure* while heating, to raise the innermost particles of the cork to a temperature above 200° C. Smith does not allow the particles to freely expand while heating by leaving them without pressure during the heating operation. In applicant's process, the heating medium finds access among the particles, heating them all above a temperature of 200° C., as stated in a previous amendment, preferably to a temperature near 400° C., the exclusion of air permitting this high heating of the particles without burning them." Remarks, letter of February 15, 1910 by attorneys Brown and Seward for Max Grunzweig, Record p. 386 (italics ours).

When another, and in time later, Examiner was called upon to consider Bertelsen (the patent in suit) in the light of Grunzweig, we find that he also rejected the application twice, Record pp. 340, 349, in three years (1921–1924). He was finally convinced after an amendment prepared "as the result of an interview" (Record p. 355).

Whatever one may think of the argument between the Examiner and Grunzweig's solicitors, one can, it seems to us, have only one view as to its later counterpart. The touch of genius claimed by Bertelsen, in the office and now, is a telescoping of a two-step process. He does not assert any different, much less novel procedure, but merely says that he does it all at once. So he turns on the steam while the cork is under pressure instead of steaming first, and heating afterwards. We think the Examiner sound in pointing both to the language of the claim and specification in Grunzweig's patent: "In a process of making masses of subdivided cork, heating in a surrounding body of gas subdivided cork with exclusion of air to a temperature above 200° C., agitating the cork while heating, charging the cork particles into a mold and pressing the same in the mold while heating." Claim 10, Grunzweig, No. 997,056; "* * * This, however, is incompatible with the simultaneous molding of the cork, that is to say with heating the cork in the inextensible mold itself, since the expansion of the cork and the resistance of the walls of the mold would cause a pressure and a diminution of the interspaces between the cork particles and so prevent free passage of the heating agent. Therefore the heating and the compression are performed in two successive steps." Grunzweig, No. 997,056, p. 2, lines 6–16, in support of his position that Grunzweig both envisaged the single process and considered it inadvisable in the usual case. The fallacy of the solicitor's argument lies, we think, in his attribution of genius to a particular method of pressure. In Grunzweig, the pressure is exerted by packing an "inextensible", p. 2 of the patent, line 9 (patent office jargon) or tight fitting (plain English) mold with cork granules and turning on the heat. In Bertelsen, the mold is not referred to as inextensible but as "a suitable shaping vessel", p. 1 of the patent, line 108, and has, in addition, "a removable perforated top plate to which the compressing pressure may be applied", p. 1 of the patent, lines 45–46. To add the external force of a plunger to the already existing force of heat expanded particles in a rigid space seems to us the slightest of mechanical improvements. If Grunzweig had not preferred to have spaces for the circulation and heating agent (steam), he or any other student of mechanics or chemistry would surely have made such a simple addition to his apparatus.

These views on *validity* make unnecessary any finding with respect to infringement. The emphasis in the District Court

trial seems to have been largely one of noninfringement. This may have been due to what we think of as an esprit de patentability, prevailing among those who benefit by patents. The learned District Court Judge filed an opinion which is convincing on the defendant's use of the two, and not the one, step process of steaming and compressing. 24 F.Supp. 913. He maintains, and successfully we think, that any use of the perforated top or plunger by the defendant is for adjustment and not compression of the granules.

The decree of the District Court dismissing the bill of complaint is affirmed.