**ILLINOIS TOOL WORKS, INC.,**
**Plaintiff-Appellee,**

v.

**FOSTER GRANT CO., INC.,**
**Defendant-Appellant.**

**No. 74–1448.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 21, 1974.

Decided Dec. 2, 1976.

Rehearing and Rehearing En Banc
Denied Dec. 30, 1976.

C. Frederick Leydig, Chicago, Ill., LeRoy G. Sinn, Leominster, Mass., for defendant-appellant.

Granger Cook, Jr., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and WYZANSKI, Senior District Judge.[*]

FAIRCHILD, Chief Judge.

This patent infringement action was brought by Illinois Tool Works, Inc. (ITW) against Foster Grant Co., Inc. (Foster Grant). ITW, as assignee, charged Foster Grant with infringement of three patents.

The district court found that all three patents were valid and infringed by Foster Grant, but denied ITW's request for treble damages and attorneys' fees under 35 U.S.C. §§ 284 and 285. The court further held that recovery for infringement of the '360 patent by Foster Grant's early Wilson-Champion containers was barred by the applicable statute of limitations, 35 U.S.C. § 286.

The court entered its final judgment permanently enjoining further infringement and ordering an accounting as to past infringement.[1] Defendant Foster Grant appealed, challenging the trial court's finding that the three patents in question are valid; that Foster Grant's products infringe the three patents, assuming their validity; and that all three patents are enforceable and that ITW is not guilty of unclean hands. ITW does not appeal the trial court's holding that the statute of limitations bars recovery for infringement of the '360 patent by Foster Grant's early Wilson-Champion containers.

## I. THE ROVICO–HOWMET ISSUE

Patent No. 3,061,139, "Self-Venting Package," was issued October 30, 1962 on an application filed March 14, 1960, Bryant Edwards, assignor to ITW. The patent was found valid in *Illinois Tool Works, Inc. v. Continental Can Company,* 273 F.Supp. 94 (N.D.Ill.1967), *aff'd,* 397 F.2d 517 (7th Cir. 1968). Foster Grant was not a party to that action.

Patent No. 3,139,213, "Nestable Cup," was issued June 30, 1964 on an application filed December 13, 1962, a division of an application filed October 29, 1958, a continuation in part of an application filed November 29, 1957, Bryant Edwards, assignor to ITW. The patent was found valid in *Continental Can, supra,* in *Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc.,* 306 F.Supp. 364 (N.D.Ill.1969), *aff'd,* 436 F.2d 1180 (7th Cir. 1971), and in *Illinois Tool Works, Inc. v. Solo Cup Co.,* 179 U.S.P.Q. 322 (N.D.Ill.1973). Foster Grant was not a party to those actions.

Patent No. 3,091,360, "Nestable Cup," was issued May 28, 1963 on an application filed October 29, 1958, Bryant Edwards, assignor to ITW. The patent was found valid in *Sweetheart Plastics, supra,* and in *Solo Cups, supra.*

In 1967 this court considered the waste of effort involved in repeated full scale trials and considerations of validity of a patent, and held that once there has been a judicial determination of validity, the party challenging validity in a later action in the same court has the burden of presenting "persuasive new evidence" of invalidity and demonstrating that there is a "material distinction" between the cases. *American Photocopy Equipment Co. v. Rovico,* 384 F.2d 813, 815–16 (7th Cir. 1967), *cert. denied,* 390 U.S. 945, 88 S.Ct. 1030, 19 L.Ed.2d 1132. The *Rovico* rule was recently explained and reaffirmed in *Mercantile National Bank of Chicago v. Howmet Corp.,* 524 F.2d 1031, 1032 (7th Cir. 1975). The court said, "For reasons of stability in the law and judicial economy, we ordinarily will not reexamine *de novo* the decision of the court in the prior case but rather will limit ourselves to a consideration of whether, assuming the correctness of the earlier decision, additional facts not before the court in the prior case require a different result.

---

[*] Senior District Judge Charles E. Wyzanski, Jr., of the District of Massachusetts is sitting by designation.

1. The injunction and accounting were stayed pending appeal. The decision of the court below is reported at 181 U.S.P.Q. 553 (N.D.Ill. 1974).

This is but an application of the doctrine of *stare decisis."*

The parties and the district court did not have the benefit of *Howmet* at the trial in the instant action. *Rovico* was discussed, however, and the district judge expressed some doubt as to the manner in which the record in the subsequent action should be made to reflect the record in the earlier action so that the *Rovico* rule could be applied. We think that the court in the second action should either take judicial notice of the contents of the record in the earlier action or admit it in evidence. At any rate, since the party challenging validity has the burden of showing new evidence and a material distinction between the cases, that party, Foster Grant here, has the burden of getting the earlier record before the court in order to demonstrate the difference. Foster Grant, however, resisted receipt in evidence of portions of the records in the earlier cases, and in several instances the district court agreed. To the extent that the district court later relied on the *Rovico* rule, Foster Grant cannot legitimately object to consideration of the factual determinations reflected in the decisions of the earlier cases.

On appeal, Foster Grant suggests that this application of the *Rovico* rule is a denial of due process, citing *Blonder-Tongue v. University Foundation,* 402 U.S. 313 at 329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). *Rovico* does not, however, call for the earlier decision to create an estoppel on issues of fact against a person not before the court in the earlier case. Its effect is, instead, very substantially to strengthen the statutory presumption which arises out of a determination of validity in the patent office, itself an *ex parte* determination. 35 U.S.C. § 282. *Rovico* is recognition of the principle that validity is an issue of law, and as long as the facts are the same, the issue of law remains the same. So viewed, *Rovico* seems a sensible and just means of avoiding wasteful, repeated *de novo* examination of an issue.

Insofar as the interest of the public in freedom from an invalid patent monopoly is concerned, the *Rovico* formula creates little problem. One judicial determination of validity, based as here, upon the adversary efforts of very competent counsel, representing clients with substantial interests at stake is a substantial safeguard of the public interest.

The district court noted the *Rovico* rule, indicated there was new evidence which it found unpersuasive, but also stated that it considered the evidence independently from and without reliance upon the prior decisions.

Considering first the adequacy of the decision on the *de novo* approach, we must observe that the decision itself demonstrates the intellectual difficulty in making a really independent examination of complex issues already thoroughly explored, some of them several times over. Although the district court gave at least lip service in deciding the obviousness issue to the step-by-step analysis required by *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 515 (1966) the decision did not as completely set out those analytical steps as we would prefer. Instead, it gave substantial emphasis to the history of problems developed in the field, failure of others to solve them, and the commercial success of the inventions. Although such matters are worthy of consideration, they are only secondary factors. *Graham, supra.*

We think that instead of attempting a review of the *de novo* determination, we should first decide whether the judgment can be affirmed under the *Rovico* rule. In so doing, we shall address the six matters which Foster Grant has labeled "Primary Errors," and then proceed to such of the "many additional grounds for reversal" as still have pertinence.

## II. THE ALLEGED "PRIMARY ERRORS"

### ERROR NO. 1

In attacking the '139 patent, "Self-Venting Package," Foster Grant produced evidence tending to show the production and sale by Kent Plastics Co. of thinwall, ther-

moformed, plastic cottage cheese containers and vented lids. Edwards made the '139 invention in October, 1959, and his application was filed March 14, 1960. The Kent sales were claimed to have begun in December, 1958 or January, 1959. This was evidence not offered in *Continental Can,* the earlier case involving '139.

The district court found: "[*T*]*he proofs are not sufficient to meet Foster Grant's burden of showing that the Kent development preceded the '139 invention* and the Kent Plastics package is different from the '139 Edwards invention in both structure and function and neither anticipates nor renders obvious the '139 invention." We have italicized the part of the finding which Foster Grant claims is clearly erroneous.

Foster Grant argues, "The proof that the Kent containers and vented lids were on sale and in public use before Edwards' '139 invention and, indeed, more than a year before the filing of his application is clear and convincing."

■ ITW relies on the heavy burden resting upon one who seeks to negative novelty by showing prior use, *Devex Corporation v. General Motors Corporation,* 321 F.2d 234, 239 (7th Cir. 1963), and argues that Foster Grant did not meet it. "It is fairly clear that Kent Plastics was doing something with the cottage cheese container and a lid prior to the Edwards invention in October of 1959. However, from the evidence presented, it is not clear what the structure was prior to Edwards' inventive date in October, 1959."

It is very clear that Kent received orders for quantities of cottage cheese containers and lids in December, 1958, and made deliveries in February and early March, 1959. The testimony of Kent personnel indicates and the supporting documents are susceptible of the interpretation that although the lids had originally been designed and made for testing purposes without vents, there was a change in design in November, 1958 so that all the lids made in quantity and actually sold, including those delivered in February and March, 1959 had notches in them, serving as vents.

Robert T. Johnson, employed by Kent as plastics engineer from May, 1956 to June, 1960, had been in charge of the project. He testified that sometime in 1958 after July 11, test use of lids and containers convinced him that the lids should be vented. The 25 cavity production mold had already been received, but was sent back to the manufacturer to be changed. By placing a pin in the groove in the mold in which the bead of the lid would be formed, an interruption, notch, or vent would be formed in the bead. He conceded the possibility that there might have been a quantity of lids produced in the mold before its change, and that the first delivery in February may have been of lids without vents, but beyond that, "there was just simply no question, they always had vents in them."

Jack Haag has been employed by Kent since 1950, and worked under Johnson. He also explained how pins or bosses were inserted in the mold cavities to produce vents. He testified that lids without notches had been produced only in the development stage, and that Kent never made unvented lids on production molds.

Certain Kent drawings, dated in March, 1959, show the vents, but they and later drawings are open to the interpretation that the vents were changes, added at a later date. There is evidence of problems experienced with the product, and attempts to make it satisfactory, and ITW appears to suggest that the idea of venting may have been one of those later changes. Unfortunately the district court did not explain its process of decision on the point. Perhaps the court considered testimony as to events from 14 years earlier subject to faulty recollection and therefore not clear and convincing. There was no impeachment of either witness except ITW's suggested bias of Johnson since he also testified for Foster Grant as its expert.

There is in evidence, however, an invoice and receiving report. The invoice, to Kent from a tool maker, is dated December 15, 1958. The amount invoiced is "To cover the

cost of altering (1) 25 Cavity Vacuum Form Mold for Container lid. (Added Boss's to Grooves.)" Kent's receiving report shows receipt December 5, 1958.

We think in the light of the testimony, the invoice must have referred to the structures in the molds which formed the notches in the lids. The documents are very persuasive proof corroborating the testimony that the mold was changed late in 1958, and that the lids produced thereafter contained the vents. Thus we agree that the portion of the finding challenged by Foster Grant and italicized above is clearly erroneous.

■ The court went on to find, however, as above quoted, that the Kent package was different in function from the '139 invention and neither anticipates it nor renders it obvious. In its brief, ITW explains that whenever the notches were first made in the bead of the Kent lid, they were so placed that there were three sealing engagements of parts of the lid with parts of the container "downstream" from the notches, i. e., in a hypothetical passage of air from the inside of the lidded container to the outside, it would pass through the vents before reaching the first of the three sealing engagements. In the '139 invention, the seal is "upstream" from the vents in order to permit the package to seal, vent, and reseal when the lid and container are in assembled relation. The difference in arrangement causes a difference in function. Foster Grant's reply did not directly address this argument.

Foster Grant proposes a further Error No. 5, and argues that the erroneous finding with respect to the Kent sales of vented lids has significance with respect to Error No. 5. We shall address that point in its sequence. Except as affected by Error No. 5, however, the court's conclusion, above quoted, that the Kent vented lids did not anticipate the '139 patent, nor render it obvious, is correct and is sustained.

### ERROR NO. 2

Foster Grant argues that plastic cups produced and sold by Continental Can in 1956–58 anticipate or render obvious the '213 and '360 patents. Apparently Continental Can had endeavored to develop lines of plastic cups, largely under the supervision of a Mr. Miller. Some of these cups were never offered to the public, but substantial numbers of at least three were sold. These were the 7¼ V, the 7 AB "D", and the 7 AB Special. Foster Grant produced Shelby and Creevy, two former Continental Can employees, and corroborative documents, showing that large numbers of these cups had been sold over a considerable period of time from mid-1956 into early 1958. Shelby and Creevy had not testified in the earlier cases.

In part, the district court found:

"With respect to Continental Can's experimental developments, they were not prior art and/or were not 'anticipations' (35 U.S.C. 102) of or did not render obvious (35 U.S.C. 103) the '213 and '360 inventions.

\* \* \* \* \* \*

"Foster Grant has challenged the claimed '213 conception date. This is pertinent because of the Continental Can 7 AB–Special Cup. The Court finds that this Continental Can cup was not developed until after Edwards made the '213 invention and, as such, is not prior art with respect to the '213 patent. I find that Continental Can was involved in the late 1950's in an experimental program of attempting to design a plastic vending cup, a plastic food container, and a plastic ice cream container. Some of the experimental designs were mere proposals, some never went beyond the drawing stage, most never went beyond the laboratory state (and were actually unsuccessful efforts or abandoned experiments), and a few were manufactured in limited quantities and apparently were distributed upon an experimental basis in limited numbers to few Continental Can customers who found them to be unacceptable. None of these was a successful container embodying either of the Edwards inventions.

"These Continental Can cups or containers are not prior art, and are no more than unsuccessful developmental efforts and/or abandoned experiments. The results of this continuous activity caused the entire plastic program at Continental Can to be abandoned and discontinued. As such, *none of the Continental Can efforts have any prior art status.*"

We have italicized the part of the finding which Foster Grant claims is clearly erroneous.

ITW does not challenge in its argument Foster Grant's assertion that it proved that large quantities of the 7¼ V, 7 AB "D", and 7 AB Special had been sold by Continental. Rather, ITW argues that because these cups did not prove satisfactory with respect to having "an operative stacker," they have "no prior art status." We think, on the contrary, that there were sufficient public sales and advertising of these cups so that their structures must be considered to the extent they are pertinent, and that insofar as the portion of the finding challenged by Foster Grant indicates that they need not be considered, it is clearly erroneous.

The district court found in the alternative that these Continental Can products did not anticipate or render obvious the '213 and '360 inventions. Hence, even if the court erred in deciding that these products need not be considered, the court did consider them and reached the same result by that route.

Continental Can Company itself challenged the validity of the '213 patent, though not the '360, in *Illinois Tool Works, Inc. v. Continental Can Company,* 273 F.Supp. 94 (N.D.Ill.1967), aff'd, 397 F.2d 517 (7th Cir. 1968). Judge Decker's opinion there shows careful consideration of the Continental Can activity relied on here, including the cups which were sold in quantity as well as those which remained intramural. He rejected the claim that they anticipated the '213, 273 F.Supp. at 107 to 110, and that they rendered it obvious, 273 F.Supp. at 115 to 117. We find no persuasive new evidence to demonstrate that

the legal issues in the present case are really different.

■ We note that, as Foster Grant asserts, the '360 was not involved in *Continental Can,* and that in considering whether the 7 AB Special, with "a stacking configuration at the bottom of the side wall, which configuration consisted of twelve semi circular indented and inclined intrusions," anticipated '213, Judge Decker stated that it was "quite different from the '213 single continuous Z-shaped ring configuration." P. 109. A difference between '213 and '360 is that claim 1 of '213 calls for "both said internal shoulder means and said external shoulder means being substantially circumferentially continuous" while the claims of '360 call for various arrangements providing circumferential discontinuity. We are not persuaded, however, that 7 AB Special anticipates '360 nor that any of the earlier Continental Can cups, considered with various other prior art elements renders '360 obvious. We note in passing that lack of commercial success of the Continental Can cups at least has a bearing upon whether they rendered the Edwards inventions obvious.

■ *Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc.,* 306 F.Supp. 364 (N.D. Ill.1969), aff'd, 436 F.2d 1180 (7th Cir. 1971), was also heard by Judge Decker. Both '213 and '360 were challenged. Judge Decker considered certain new evidence, found it unpersuasive, and, denied the attacks, on both patents under *Rovico.* Apparently the defendant there did not attempt to attack '360 separately from '213 on the basis of the earlier Continental Can products as Foster Grant does here.

This court affirmed as to '213 on the authority of *Rovico.* As to '360, this court gave separate consideration finding no anticipation, and, after a *Graham* analysis, no obviousness, and affirmed.

The validity of both '213 and '360 was again challenged in *Illinois Tool Works, Inc. v. Solo Cup Co.,* 179 U.S.P.Q. 322 (N.D.Ill. 1973). The district court (Judge Austin) reexamined the issues rather than relying wholly on *Rovico,* although he noted and

doubtless gave effect to the increased weight of the presumption of validity, arising from the earlier ITW decisions. 179 U.S.P.Q. at 344. On the facts before him, Judge Austin concluded that the earlier Continental Can cups were experiments which failed, 179 U.S.P.Q. at 346 and 354 to 362. But he also decided, among other things, that even if the 7 AB Special were prior art, it did not anticipate nor render obvious the '213 or '360 inventions. 179 U.S.P.Q. at 359–60.

Although Foster Grant appears to have proved more substantial sales of several of the earlier Continental Can cups than proved in the earlier cases, it has not persuaded either the district court or us that any of them anticipated or rendered obvious the '213 or '360 inventions.

### ERROR NO. 3

In the matter to which Error No. 4 pertains, Foster Grant relies on a statement in the specifications of '360 in interpreting the claims in '213. Foster Grant challenges the court's statement that "The statements in the specification of the '360 patent are irrelevant to the claims in the '213 patent." It is unnecessary to discuss this proposition apart from Error No. 4.

### ERROR NO. 4

Foster Grant challenges the assertion of the district court that: "Foster Grant relies on a statement in the specification of the '360 patent to equate lip and rim. . . The Court does not consider the lip to be the rim, but rather to be a separate entity attached to the rim."

The problem arises in connection with the claim that certain Foster Grant cups infringed Claim 1 of '213. Under Claim 1 the sidewall of the container (cup) tapers generally upwardly and outwardly "to an upper margin defining an open upper end . . said upper margin having a rim of predetermined axial extent which is of sufficient increased lateral width relative to the thickness of the thin plastic sidewalls to lend required lateral strength at said open upper end" and the sidewall has circumferential

stacking ring means "positioned below and spaced axially from said upper rim and having an axial extent greater than the axial extent of the rim portion. . . ."

At the top of the upper body portion of one of the accused Foster Grant cups there is an outwardly and downwardly turned portion which ITW has designated RIM on the drawing reproduced in this opinion.

This portion continues into a downwardly and inwardly turned portion which we shall refer to as a skirt. The district court took the position that the skirt is the "lip" as the word is used in the patent, and that for the purpose of the claim language concerning the position of the stacking ring, the upper rim is as designated RIM on the drawing and does not include the skirt ("lip"). When "upper rim" is thus limited, the stacking ring means is entirely "below and spaced axially from said upper rim" and infringement was properly found.

If the "upper rim" be deemed to include the entire skirt, then the upper rim of the accused cup, extends, at least on the outside of the cup, to a level axially below the upper portion of the stacking ring means, and it would follow that the terms of the claim are not literally fulfilled by the accused cup.

Foster Grant maintains that the use of the word "lip" in the '213 claims, forces the conclusion that either the '213 patent is

invalid under 35 U.S.C. § 102(b), or that Foster Grant's cups do not infringe the '213 patent.

The argument goes as follows. 35 U.S.C. § 120 provides that an applicant of a later filed application may have the benefit of the filing date of an earlier, copending application, providing that the applicant has satisfied the requirement of 35 U.S.C. § 112 that the specification in the application contain a ". . . written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same. . ."

In the case at bar, the '213 patent issued on an application filed December 13, 1962, Serial No. 244,320, and explicitly relies for an effective filing date upon a first application filed November 29, 1957, Serial No. 699,678, and upon a second application filed October 29, 1958, Serial No. 769,057. The first application was abandoned after the second application (a continuation-in-part, or C.I.P.) was filed. The '213 patent was granted on the 1962 application which was filed as a divisional application of the second or C.I.P. application of October 29, 1958.

It is obviously crucial to the validity of the claims of the '213 patent that they relate back to the parent application of 1958. If they do not relate back, then the validity of '213 is judged in light of the prior art as of the December 13, 1962 filing date, and the patent is probably invalid for anticipation under 35 U.S.C. § 102(b) by ITW's sale of its products prior to 1962, but after 1958.

Given this analysis, Foster Grant argues that ITW may not have the benefit of the earlier filing date, because the trial court found that the description of the patented cup in the specifications varied from that of the cup in the patent claims. Specifically, the application of November 29, 1957, Serial No. 699,678, described the cups at issue as follows: "[T]he upper body portion . . is terminated by an outwardly and down-

wardly turned *lip* . . . ." (Emphasis added.) The application of October 29, 1958, Serial No. 769,057 described the cup: "[T]he upper body portion . . . is terminated by an outwardly and downwardly curved *lip* or *rim*." (Emphasis added.) The application of December 13, 1962, Serial No. 244,320 described the cup: "[T]he upper body portion . . . is terminated by an outwardly and downwardly turned *lip*." (Emphasis added.) As already stated, Claim 1 of the '213 patent includes a circumferential stacking ring means ". . positioned below and spaced axially from said *upper rim* and having an axial extent greater than the axial extent of the *rim portion* . . . ." (Emphasis added.)

The trial court found that the "lip" described in the November 29, 1957 application and the December 13, 1962 application was different from the "rim" referred to in the '213 claim, and that the equation of lip and rim in October 29, 1958 application was irrelevant to the '213 patent because it was the parent application of the '360 patent. Foster Grant urges the ingenious argument that ITW is caught in a Hobson's choice on this issue. If we affirm the district court's finding that lip and rim are used differently, then the '213 patent cannot have the benefit of the earlier 1958 application because the specification does not conform to 35 U.S.C. § 112. Thus the '213 patent is invalid *per se* both because § 112 is not fulfilled and because of anticipation as of the 1962 filing date.

On the other hand, urges Foster Grant, if we disagree with the district court and find that lip and rim are used synonymously, then the patent is valid but Foster Grant's cup does not infringe, because its stacking ring is not spaced axially below the skirt, or *downturn* of the lip.

We reject Foster Grant's arguments and affirm the district court's finding of infringement notwithstanding the extent of the downturning skirt in the accused cup.

Both the '213 and '360 specifications state that it is the object of the invention "to provide a cup having a step or shelf intermediate its top and bottom edges . . . ."

etc., and "to provide a frusto-conical cup having a shelf or step, intermediate its top and bottom margins . . ." etc. These statements, speaking in terms of edges and margins, suggest that the downward extent of an outer skirt is immaterial to the positioning of the stacking ring means. As pointed out by the district court, it is evident that the inventor intended to differentiate the invention from a rim stacker.[2] The language of the claim is appropriately interpreted with that in view.

Both specifications disclose that "The upper body portion 16 is terminated by an outwardly and downwardly turned lip 18." Foster Grant points out the dictionary definition of rim as "the outer often curved or circular edge or border of something" such as a cup, and that in such context rim, brim, lip, and margin are synonymous. Webster's Third New International Dictionary. But although these terms may be synonymous and describe identical portions of a structure, we are mindful of the difficulty of applying exact labels to portions of a varying continuum, and do not find that an extended downward hanging skirt, though it may be part of the "lip" need be part of the "upper rim."

We are aware of the difference in claim language between the two patents, '360 referring to positioning the stacking ring means below the "upper margin," and '213 to positioning such means below and spaced axially from the "upper rim." We have considered Foster Grant's argument that the adoption of the language in '213 created a file wrapper estoppel pertinent to this case. Whatever may have been the reason for the change in terminology, we do not find that it implied any disclaimer which would be significant in this case.

Therefore we conclude it is reasonable to construe the claim so that the "upper rim" is the portion of the accused cup so indicated on the drawing reproduced in this opinion, and it follows that the stacking ring means is positioned below and spaced axially from it. The same construction was

made, in answer to the same argument advanced here by Foster Grant, in *Illinois Tool Works, Inc. v. Solo Cup Co.*, 179 U.S. P.Q. 322, 332–33 (N.D.Ill.1973).

To secure the benefit of the 1958 application under 35 U.S.C. § 120, ITW's assignor had to comply with the mandate of the first paragraph of 35 U.S.C. § 112 that the specification contain a written description of the invention ". . . in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same . . . ." Exact identity of description is not required, but ". . . the relevant inquiry under the 'how to make' requirement of paragraph one of 35 U.S.C. § 112 is whether the scope of enablement provided to one of ordinary skill in the art by the disclosure is commensurate in scope with the protection sought by the claims." *Application of Cescon*, 474 F.2d 1331, 1335 (U.S.Ct. of Cust. and Pat.App. 1973). See also, *Application of Cormany*, 476 F.2d 998 (U.S.Ct. of Cust. and Pat.App. 1973).

On the facts of this case, notwithstanding the fact that lip, margin, upper rim and rim seem not always to have been given identical content, we conclude that the several disclosures are adequate, see *Yosemite Chemical Co. v. United States*, 360 F.2d 948, 952, 175 Ct.Cl. 623 (1966), and would enable one skilled in the art to practice the invention. They are sufficiently consistent with each other so that the later application has the benefit of the filing date of the earlier under § 120.

### ERROR NO. 5

Foster Grant contends that the district court "erroneously excluded evidence of admissions against ITW's interest relative to certain containers and lids held to be infringements in the *Continental Can* and *Sweetheart* cases."

Foster Grant desired to advance two applications of the epigram, "that which in-

2. In a rim stacker, the rim structure itself comprises the upper shoulder and no shelf or support structure is provided apart from, in addition to, and spaced below the rim.

fringes, if later, would anticipate if earlier." *Knapp v. Morss*, 150 U.S. 221, 228, 14 S.Ct. 81, 37 L.Ed. 1059 (1893). One is that the Kent containers and vented lids sold in early 1959 were identical to certain Continental Can containers and lids found to be infringements of '139 in *Continental Can, supra*. The other is that the 7 AB Special cups sold by Continental Can in 1956–68 were similar to the CVP 9 cup found to infringe '360 in *Sweetheart Plastics, supra*.

Even though the district court found, and we agree, that the Kent products did not anticipate '139 and the 7 AB Special cups did not anticipate '360, it is suggested that ITW must, in obtaining findings of infringement in the earlier cases, have obtained a broader construction of these patents than we now recognize, and that ITW is now estopped from narrowing the construction. *Smith v. Hall*, 301 U.S. 216, 232, 57 S.Ct. 711, 81 L.Ed. 1049.

Although the district court might well have allowed inquiry to test the soundness of these applications, we find no reversible error.

With respect to '139, the formal offer of proof was only that particular exhibits were a container and lid of the type accused in *Continental Can*. There was no formal offer of testimony that the exhibits were identical to the Kent Plastics products. Apparently the container and lid came into the record in another connection. ITW has asserted in its brief, without contradiction by Foster Grant, that the Kent and Continental Can products were compared and discussed in briefs in the district court, and that it is clear that in the Continental Can lids the seals were upstream from the vents, as in '139, while they were downstream in Kent. Thus the Foster Grant contention breaks down.

With respect to '360, the formal offer of proof was similarly limited. More importantly Foster Grant in its brief claims merely "similarity" between the infringing Sweetheart cup and the 7 AB Special. Nothing suggests specifically how it was that the infringement finding in *Sweetheart Plastics* must have committed ITW to a construction of the claims such that the 7 AB Special would anticipate.

## ERROR NO. 6

Foster Grant challenges the district court's conclusion (and its finding to the same effect) that "ITW has not been guilty of . . . unclean hands, and [the three patents] are each enforceable."

The challenge is supported by claims of misrepresentations and failures to disclose to the Patent Office. Not all the claims argued in this court were presented to the district court.

### *The Lid-Popping Problem*

The '139 patent claimed a self-venting package with arrangement such that holding and venting means would be on the downstream side of sealing means "when gaseous material within said container means causes said sealing means portions to disengage with each other" and holding the container and closure in assembled relation "during egress of gaseous material under pressure and emanating from the interior of said container means."

The specification describes a problem encountered in packaging food stuffs in plastic containers having removable lids. "This is especially true if the food stuff to be packaged is of the type (such as cottage cheese) which generates a gas after being enclosed in a package." It is further explained (in part):

> "When a container 12 is filled with a material such as cottage cheese and the lid 14 is assembled thereto, the biological action of the cottage cheese continues and the cheese ferments or 'works' and thereby self-generates gas. Also some gas (air) is trapped during the assembly of the lid to the filled container.

> "Thus, at some later time after packaging, due either to a change in temperature which increases the pressure of the trapped gas or due to the pressures of the gas generated in the interior of the containers package, or a combination thereof, normal lids are literally popped or unseated relative to the container means.

Therefore, in the plastic containers and lids shown, it is desirous to leave a venting means which affords easy egress of gas from the interior of the container while still affording a tight seal to maintain sanitary conditions at all other times."

There was proof, as found by the court, that when all-plastic cottage cheese tubs were first used, an unexpected lid-popping problem occurred during handling, shipping or storage. Apparently part of the problem arose at the time of the capping operation: pressure from trapped air made the lid unstable. Various solutions have been developed for this problem. There was also a problem apparently caused by an increase in pressure subsequent to capping. The latter was believed to result from an increase in pressure as a result of generation of gas by the cheese. '139 related to the latter. Edwards, the inventor, and ITW never made tests to verify the belief that pressure increased as a result of gas production. Foster Grant produced proof that only minute quantities of gas are emitted by cottage cheese of marketable quality.

█ The unclean hands claim in this respect is based on the representations as to the cause of the problem of increase in pressure after packaging and that the '139 invention solved it. Certain reports of a Mr. Engle, when employed by ITW, dealt with the trapped air part of the problem, and his solution for it, and are claimed to have put ITW on notice that the '139 invention did not avoid lid popping. The proof is somewhat equivocal as to whether there is in fact a substantial problem of lid popping from some cause other than trapped air. As found by the Court, the evidence gives reason to doubt that internal pressure buildup is caused by gases emanating from cottage cheese. The district court found:

"The evidence establishes that ITW believed that cottage cheese does generate gas and no evidence was presented to

suggest that ITW felt differently before or during the prosecution of the '139 patent. Thus this contention of an alleged misrepresentation is without foundation." The finding is not clearly erroneous.

*Nondisclosure of Prior Art*

█ In prosecuting the '360 and '213 patents, ITW did not bring to the attention of the Patent Office certain cups and patents of which ITW's representatives were aware. By hindsight, several of them seem sufficiently relevant so that disclosure (to the extent ITW was aware of them) would have been appropriate, and perhaps required by high standards of candor. Each, however, has been considered by courts in one or more of the earlier cases, *Continental Can, Sweetheart Plastics,* and *Solo* and found not to anticipate these patents nor render them obvious.

These items are a so-called Caine cup, so-called Continental Can cups (7¼ V, 7 AB–D, and 7 AB Special), Nowak Patent No. 2,749,572, Gardner Patent No. 3,004,288, Aldington Patent No. 2,985,354, Caine Patent No. 3,045,887.

*Misrepresentation of Commercial Success*

Foster Grant points to representations by ITW in the prosecution of '360 which claimed certain commercial acceptance of containers which were later found unsatisfactory. At best the matter is somewhat equivocal.

Insofar as these matters were raised before the district court, the court's refusal to find unclean hands is not clearly erroneous. Insofar as they were not raised, we see no reason to consider them on appeal.

### III. THE ALLEGED "MANY ADDITIONAL GROUNDS FOR REVERSAL"

*Infringement of '139*

Foster Grant challenges the trial court's finding of infringement on five grounds.[3]

---

**3.** ITW charged that all of Foster Grant's packages (represented by the Wilson-Dow cup chairman and associated lid, the Wilson-Foster cup chairman and associated lid, and the Foster Grant current commercial cup chairman and associated lids) infringe one or more of asserted Claims 1, 2, 6 and 7 of the '139 patent. The district court agreed with all charges of infringement.

First, citing *Deepsouth Packaging Co. v. Laitram Corp.*, 406 U.S. 518, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972), it contends that it makes and sells only empty dry containers and lids, that do not seal when assembled dry. *Deepsouth* does not support the proposition. That case involved a combination patent and held only that manufacture and export in the United States of the components of a combination patent for assembly and use in another country do not constitute direct infringement in the United States. In the present case, the intended and normal use of Foster Grant's lids and containers is to be filled with wet food stuffs, such as cottage cheese, which trigger the sealing and venting properties of the package. Foster Grant does not allege that its lids and containers are filled and sealed outside of the United States, nor that the filling of the containers with wet food stuffs is an unexpected or distorted use. Indeed when sold by Foster Grant the containers and lids are both imprinted with the customer's name and cottage cheese designation.

Second, Foster Grant challenges the finding of infringement on the ground that the only evidence of infringement are the results of a distorted test conducted by Edwards, ITW's assignor.[4]

The district court in finding infringement relied on application of the claim language of '139 to the accused packages and on the language of Foster Grant's own patent, as well as on the Edwards test. Foster Grant was at liberty to conduct its own tests if it wished, and in fact extensively cross-examined Edwards on the results of his tests. The evidence in the record supports the district court's finding of infringement.

Third, Foster Grant finds it significant that Edwards "admitted he had never seen in commerce defendant's [Foster Grant's] container and lid assembled as a package or containing food." Foster Grant does not seriously contend that in fact its lids and containers are not assembled as packages to contain food in commerce. The mere fact that Edwards personally did not see them so used is irrelevant.

Fourth, Foster Grant asserts as error the fact that there was no evidence that any specific assembled container and lid made by Foster Grant sealed, vented and resealed when containing food. This assertion misapprehends the burden placed on a plaintiff in a patent suit. ITW demonstrated through tests, application of the '139 claim language to the accused cups, and the language of the Foster Grant patent that the accused cup had the capability of sealing, venting, and resealing. Moreover, Foster Grant's own expert admitted that in normal commercial production excess gas is sometimes found in the Foster Grant packages, and that the packages did vent in the manner described in the '139 patent. ITW was not required to prove that any specific container sealed, vented, and resealed when used in commerce or containing food.

Finally, Foster Grant argues that its accused container and lid packages do not have some of the structures called for by Claim 1 of '139.

A pertinent portion of the claim called for the "container means having a portion of the sidewalls offset radially outwardly relative to other portions of the sidewalls." Everyone agrees this describes a groove, and the accused container has a groove. The claim further calls for the "container means and . . . closure means [lid] each being formed with a sealing means portion for normally engaging each other to seal said container means when in assembled relation." The accused lid has a bead which fits into the groove, and there is evidence that a seal occurs between them. The claim further calls for "one of said closure means and container means being formed with an integral combination holding and venting means portion adapted to be associated with said [groove], said hold-

---

4. Edwards assembled lids on empty containers after putting a layer of milk on the inside of the container lid receiving groove to obtain a seal, and then pumped in compressed air. He testi-

fied that he moistened the groove in order to simulate conditions that actually occurred when the containers are filled with cottage cheese.

ing and venting means portion being arranged relative to said respective sealing means portions so as to be on the downstream side of said sealing means portions when gaseous material within said container means causes said sealing means portions to disengage with each other, said holding and venting means having no axial movement and thereby holding said container and closure in assembled relation—during egress of [gas]."

In at least one embodiment described in the specification, there are lugs on a slanted edge of the bead of the lid. These lugs engage the upper portion of the groove and retain the lid in assembled relation to the container and space the surface of the upper portion of the groove from the lid sufficiently to provide a vent for the egress of gas.

In the accused package, there are vertical slots in the so-called barb (upper and inwardly extending portion of the groove) which provide a vent for the gas. The district court, in finding infringement, held that "the integral combination holding and venting means portion directly reads on both 'slot or hole' and the inwardly extending portion (i. e., the barb). . . . The slots in the cups coact with, cooperate with, and are 'associated with' the groove in the cup."

The inventor, Edwards, testified, in connection with a chart, and referring to the claim language "integral combination holding and venting means portion,"

"This phrase, the lines are connected to the portion just above the groove in the container and in both photographs, this portion just above the groove is what retains the lid in place and it also has interruptions in it to provide the venting."

He further characterized the upper interim part of the groove as the "lid retaining barb" and referred to "the venting and holding means in the barb of the container. . . ."

We find no error in the court's holding, and reject Foster Grant's claim that the court read the integral combination holding and venting means language on the groove itself, a claim element.

*Minute Difference Between '213 and '360*

Claim 1 of '213 calls for circumferential stacking ring means formed in the sidewalls, including externally projecting shoulder means and internal shoulder means projecting inwardly, both said shoulder means "being substantially circumferentially continuous."

Claim 1 of '360 calls for "at least one of said shoulder means having separate means associated therewith for cooperation with a shoulder means of a nested cup to provide a circumferentially discontinuous area to assure air communication between completely nested cups and consequent freedom of individual cup separation from a stack."

Foster Grant complains that ITW originally took the position that the shoulders of four cups were "substantially circumferentially continuous" notwithstanding the presence of certain notches, and that the cups infringed '213. Shortly before trial Edwards conducted physical tests to determine whether there was air communication, and at trial testified that these four cups infringed '360 rather than '213.

Foster Grant attacks the validity of the test and also argues that the claims of both patents are invalid under 35 U.S.C. § 112 for failure particularly to point out and distinctly to claim the invention. We find no merit in either argument. The existence of air communication and freedom of cup separation sufficiently distinctly marks the line between the patents, and the test could be accepted by the district court as a reasonable means of determining on which side of the line particular cups fall. The fact that defendant's expert reached a different conclusion with a different test raises questions only of weight and credibility of evidence.

*Rejection of Defendant's Tests*
*for Resiliency*

The same comment as the foregoing applies to the comparison of tests conducted

by the parties to demonstrate the resiliency of various types of cups in stacks.

Resiliency as a result of the structures described is significant in both '213 and '360. Claim 1 of '213 closes with the following: "said intermediate section of the stacking means inclined inwardly and upwardly toward the cup axis to present the aforesaid inner shoulder means and to provide a thin-wall, resilient support therefor when axial pressure is applied there against by the external shoulder means of a like, telescopically associated container." Claim 1 of '360 closes with the following: "the inherent flexibility of the thin plastic material of the cup in combination with the aforesaid structural features serving to impart resilient action to a stack of nested cups without jamming when such cups are subjected to axial pressure."

Apparently, in presenting its claim that the subject matter was anticipated or obvious, Foster Grant attempted to prove that containers in existence prior to the critical dates achieved the resiliency claimed. Tests were run on recently fabricated cups simulating the form of cups which had been produced prior to the critical dates.

 Foster Grant objects to the underlined assertion in the following passage, set forth by the district court:

> Specifically, Johnson, Foster Grant's expert, admitted on cross-examination that there was no attempt to duplicate the process variables, such as sheet thickness (R. 2283), plug design (R. 2284–87, 2291–94), and plug temperature (R. 2288–90, 2293–94) which were actually used to make the alleged prior art cups. Johnson also admitted that the selection of these variables alters the construction and performance of a cup or container (R. 2294–95). These tests were all made on cups and containers manufactured by today's technology. The mission of this Court is to determine the prior art 'at the time the invention was made', 35 U.S.C. 103. The advance in technology since 1957 and 1958 cannot be denied and demonstrating what can be achieved with today's technology does not shed any light on what

was possible with the technology existing when Edwards made the '213 and '360 inventions. Consequently, *these 'after the fact' tests conducted by Foster Grant for the purpose of this lawsuit have limited probative value.* [Emphasis added.]

We can find no fault with the statement objected to.

The judgment appealed from is AFFIRMED.